# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# NORTHERN DIVISION

MARILYN CARMACK,                          )
                                          )
      Plaintiff,                   )
                                          )
    vs.                              )          No.   2:11CV075TIA
                                          )
CAROLYN W. COLVIN,[1]                     )
Commissioner of Social Security,          )
                                          )
      Defendant.                  )

## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).  The suit involves an Application for Disability Insurance Benefits under Title II of the Social Security Act.  Claimant has filed a Brief in Support of her Complaint; the Commissioner has filed a Brief in Support of his Answer.

## I.     Procedural History

Claimant Marilyn Carmack filed an Application for Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 60-75).[2]  Claimant, who was born on October 16, 1954, initially applied for benefits on March 9, 2004, alleging a disability onset date of

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is therefore substituted for Michael J. Astrue as the Defendant in this action.

[2]"Tr." refers to the page of the administrative record filed by the Defendant with its Answer (Docket No. 5/filed December 8, 2011).

December 2, 2003, due to severe pain in her right hip and knee as a result of avascular necrosis.[3] (Tr. 24).  On initial consideration, the Social Security Administration denied Claimant's claims for benefits.  (Tr. 24-28).  Claimant requested a hearing before an Administrative Law Judge ("ALJ").  On July 21, 2006, a hearing was held before an ALJ.  (Tr. 345-71).  Claimant testified and was represented by counsel.  (Id.).  Vocational Expert Denise Waddell also testified at the hearing.  (Tr. 48-49, 365-70).  Thereafter, on March 27, 2007, the ALJ issued a decision denying Claimant's claims for benefits finding that although Claimant could not perform her past work as a registered nurse, she had the residual functional capacity to perform light work, and that she was not disabled as defined by the Act.  (Tr. 11-19).  The Appeals Council on December 7, 2007, found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision.  (Tr. 7-9).  On February 6, 2008, Claimant filed her Complaint in this Court. After considering the briefs of the parties, the Honorable Richard Webber remanded the case to the ALJ for further proceedings consistent with the Order of January 27, 2009.  (Cause No. 2:08cv10ERW, ECF No. 14).

On May 22, 2007, Claimant filed a subsequent claim for Title II benefits alleging disability due to autoimmune disorder, bone pain, and joint problems.  (Tr. 473, 478-84).  The Appeals Council's action with respect to the current claim renders the subsequent claim duplicate, and so ordered the ALJ to associate the claim file and issue a new decision on the associated claims.  (Tr. 424).  Claimant requested a hearing before an ALJ.  On August 13, 2009, a hearing was held

---

[3]     Avascular necrosis - or osteonecrosis - is the death of bone tissue due to a lack of blood supply.  This can lead to tiny breaks in the bone and the bone's eventual collapse. Avascular necrosis most often affects the head of the thighbone (femur), causing hip pain. The condition is progressive.  http:// www.mayoclinic.com.

before an ALJ.  (Tr. 719-42).  Vocational Expert John McGowen also testified at the hearing.
(Tr. 48-49, 470-72, 739-41).  Thereafter, on November 23, 2009, the ALJ issued a decision
denying Claimant's claims for benefits finding Claimant has the residual functional capacity to
perform light work activity with occasional climbing of ladders, ropes or scaffolds, and avoiding
concentrated exposure to vibration and hazards.  (Tr. 381-94).  The Appeals Council on August
20, 2011 found no basis for changing the ALJ's decision and denied Claimant's request for review
of the ALJ's decision.  (Tr. 372-75).  The ALJ's determination thus stands as the final decision of
the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

### A.  Hearing on July 21, 2006

Claimant, who was represented by counsel, testified that she listed a disability on-set date
of December 2, 2003, because that was when her doctor took her off work.  Claimant stated that
she was married, had three grown children and two grown step-children, and lived with her
husband in a house.  She had been a registered nurse for fourteen years.  In early 2004, she tried
to work in the nursing office doing paper work, but this did not work out because she could not
sit, and her doctor advised her to quit.  She did not work after that.  Prior to her working as a
nurse, she primarily raised her children.  (Tr. at 349-52).

Claimant testified that "bone pain" in her lower extremities and shoulders prevented her
from working.  As treatment, she took pain medication and saw a doctor once every four weeks.
She was also taking medication for a condition that caused her to fall asleep while standing up.
Claimant said that she suffered from terrible fatigue.  She stated that she was not receiving any

- 3 -

mental health treatment.  She still had a lot of pain in her right hip down to her groin and still used her crutches and a cane, because she could not bear a lot of weight on that hip.  (Tr. at 352-54).

Claimant testified that on a typical day, she got up at about 5:00 a.m., went to the living room to watch the news and drink coffee, took a shower, and then went back to bed and slept for about four hours.  She testified that she could do a load of laundry, load the dishwasher and drive to the grocery store six blocks away.  Claimant testified that she did not engage in any activities outside the home, did not socialize with any friends, and did not have any hobbies.  She said that on a good day, she could stand for forty-five minutes to one hour before having to sit down, and could sit for thirty or forty minutes before having to reposition herself.  She could walk two blocks before her pain would begin to bother her.  Claimant estimated that she could probably lift twenty pounds, but that she did not know because she had not really tried to lift anything.  She did not know if she had the energy to do a job where she could sit most of the day and stand if she needed to and would not have to deal with lifting or carrying anything heavy.  Claimant explained that her fatigue felt "like [she was] on the downhill slide from a bad Flu or something."  She stated that, on average, she sat, with her feet up, in a recliner for six or seven hours each day, and that she had to sleep flat on her back to avoid hip or shoulder pain.  (Tr. at 354-58).

Claimant testified that she had enjoyed her work and made good money as a nurse.  She stated that she would not be able to perform the duties of a nurse at the local hospital, because she could not do patient care while she was under the influence of narcotics.  Claimant testified that the medications she took slowed her mental capacities and that she tended to forget things short-term.  She said that she had sought treatment from different doctors, but none had been able to treat her successfully.  (Tr. at 358-60).

- 4 -

When asked how long she could sit during an eight-hour work day, Claimant answered that she spent a lot of time lying down and that she did not know how long she could sit and work productively.  She estimated that she could stand for forty-five minutes at most, without feeling pain that would start in her groin.  Claimant said that she had constant pain in her right hip, pain that was "severe" and "deep burning . . . deep in the bone," which was aggravated by sitting, standing, walking, turning over at night and laying on her hip, and bending down.  She also had trouble walking on uneven ground.  (Tr. at 360-62).

Claimant testified that she had no difficulty grocery shopping at her small local store, but thought she would be able to shop at a larger shopping center for only an hour "once in a while," after she had medicated herself, and with her husband along to help with the larger items.  She also stated that she did not drive "that kind of a distance" to the shopping center because it was too dangerous for her to drive when on her medications.  She tried not to be around people, strangers, or crowds because, if she were, she felt stressed.  (Tr. at 362-64).

Claimant testified that the doctors had not suggested any physical therapy for her.  She testified that she was prescribed Neurosed and Neuroprex for jerking movements that she experienced daily if she did not take the medicine.  Even with the medication, the shaking did not completely go away, and approximately twelve or fourteen times per month she experienced shaking, especially when she was tired.  At such times, she had difficulty keeping her balance and would hold on to furniture.  She used a cane or a crutch a couple of times per week.  (Tr. at 364-65).

The ALJ then asked the VE whether an individual of Claimant's age, education, and work history, who could only perform light exertional work[4] with no ropes, ladders, scaffolds, vibrations, crawling, or crouching, could perform Claimant's past work.  The VE responded in the negative.  The VE further testified that such an individual would have no transferable skills to light work with the additional noted limitations, but that there were light unskilled jobs which the individual could perform, including mail sorter, bench assembler, and machine tender.  The VE further testified that the individual would have no skills that would be transferable to sedentary work,[5] but that there were sedentary unskilled jobs which the individual could perform, including production checker, order clerk, and printed circuit board assembler.  The VE testified that if the individual would miss work on an average of two days per month or would have to take a total of one hour of breaks in addition to regular breaks (per day), she would not be able to not hold any job.  (Tr. at 365-69).

---

[4]    "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of up to ten pounds; and that might require a good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls.  Social Security Ruling ("SSR") 83-10 elaborates that the full range of light work requires standing or walking, off and on, for a total of approximately six hours in an eight-hour work day, while sitting may occur intermittently during the remaining time; that the lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping; and that many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk.  SSR 83-10, 1983 WL 31251, at *6 (1983).

[5]    Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; sitting for about six hours and standing for up to about two hours in an eight-hour workday. 20 C.F.R. § 404.1567(a); SSR 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

In response to questions by Claimant's counsel, the VE testified that the person described in Dr. Dominguez's December 9, 2005 Medical Source Statement could not perform Claimant's previous work or any other full-time work, because the sitting and standing limitations imposed by Dr. Dominguez permitted only part-time work. (Tr. at 369-70).

**B. Hearing on August 13, 2009**

Claimant, who was represented by counsel, testified that she is married and lives with her disabled husband. (Tr. 724). Claimant received her nursing degree from Mobley Junior College in 1992. (Tr. 725). Claimant last worked as a RN in December 2003. (Tr. 726).

The ALJ asked Claimant to explain why the federal judge noted in the remand order as follows: "the court is troubled as was the ALJ by the September 22, 2005 notation that plaintiff was driving a distance of about 125 miles weekly to care for a grandchild." (Tr. 728). The ALJ pointed out at the earlier hearing, Claimant testified that she did not drive long distances. (Tr. 729). In response to the ALJ's query regarding the inconsistency of her testimony, Claimant testified that she tried to help her daughter as much as she could, but she has not done so for a long time. Claimant further testified that she helped her daughter for a couple of weeks after the birth of her grandson. (Tr. 729).

When asked if she could work a sedentary nurse job such as a phone nurse in a medical office, Claimant responded no because of memory issues, and she has to lie down so much. (Tr. 730). Claimant testified that she thinks her memory loss is not caused by the side effects of her medications. (Tr. 738). She no longer answers the telephone, because if she writes down a message, she cannot remember where she placed the message. (Tr. 738). If Claimant reads a

- 7 -

book, she has to start again at the beginning, because she cannot remember what she read.  (Tr. 739).

When the ALJ inquired of Claimant why she was crying at the hearing, she explained she is in pain and does not want people to question her veracity.  (Tr. 730).

Claimant testified that she could sit for thirty to forty-five minutes before becoming uncomfortable.  (Tr. 731).  She experiences constant fatigue.  (Tr. 731).  She said she was not sure if her sleepiness is a side effect of her medications.  (Tr. 732).  Claimant takes naps throughout the day and usually two hours in duration.  (Tr. 736).  She takes morphine 60 mg for pain twice a day, Avinza 120 mg, an extended release morphine, at bedtime, Darvocet for breakthrough pain, lidocaine patches, Cymbalta, and Neurontin.  (Tr. 736-37).  .

Claimant testified that Dr. Koehn has diagnosed her with some type of autoimmune disease and treating her symptoms.  (Tr. 732-33).  She has loss in the range of motion in her left shoulder but after a fall last fall, her shoulder problem increased.  (Tr. 733).  In the last five days, Claimant has fallen three times.  (Tr. 734).  Claimant fractured her left wrist after a fall in October 2008 caused by her losing her balance.  (Tr. 734).

The ALJ then asked the VE to describe Claimant's past work as a registered nurse, in particular the skills and the exertional level.  (Tr. 739-40).  The VE testified that Claimant's past work as a general duty registered nurse at General John Pershing and Carroll County Memorial, is medium, top of skilled, and reasoning ability of 5.  (Tr. 740).  The physical demands of the job included occasional stooping, frequent reaching, handling, fingering and feeling, talking, hearing, eyesight, and noise moderate.  The VE testified that Claimant does not really have any transferrable skills to the sedentary exertional level.  (Tr. 740).

- 8 -

### 3. Work History and Application Forms

On her Work History Report, dated March 8, 2004, Claimant indicated that, from 1992 to 2003, she worked at a salary of $37,000 per year as a registered nurse in a rural hospital. (Tr. at 78, 90). In this position, Claimant took care of patients, administered medication, worked in the emergency room, completed paper work (chart checks and physician orders), admitted and discharged patients, and educated patients who were going home. (Tr. at 90). Claimant wrote that she stopped working when the pain in her right hip and knee became too severe. (Tr. at 96). Claimant's earning record shows minimal earnings from 1972 to 1992. Between 1992 and 2003, her earnings increased from $13,431.89 to $37,948.91. (Tr. at 63). In the Disability Report Adult, Claimant reported having to walk with the aid of crutches. (Tr. 76-85). In the Disability Report - Field Office, the interviewer observed Claimant walk with crutches, and her husband drove her to the appointment. (Tr. 86-88).

On her application for benefits, Claimant indicated that she could do household chores that required standing for short periods, because prolonged standing increased the pain in her leg. She shopped at least once a week for groceries, but could only spend about thirty to forty-five minutes in the store. She reported that she woke up frequently at night due to pain, and some nights, she did not sleep at all. She dressed herself sitting down. Claimant's hobbies were reading and watching TV, but sitting for too long caused as much pain as standing. Additionally, Claimant's pain medication made her drowsy, so after taking the medication, she had to reread certain things. Claimant could use the computer for thirty to forty-five minutes if she sat in a wooden chair, and for less time if she sat in a soft chair. About twice a month, Claimant drove to her daughter's home, approximately two-and-a-half hours away. Claimant indicated that she had no difficulty

- 9 -

following written or verbal instructions and that she did not have to be reminded to complete chores.  (Tr. at 98-100).

In the Disability Report - Adult, Claimant reported having limited mobility.  (Tr. 495-504).

## III.    Medical Records

On November 25, 2003, Claimant was diagnosed with right-side sciatica and given prescriptions for Vicodin, Vioxx, and Zanaflex. (Tr. at 153).  On December 16, 2003, an x-ray of Claimant's right hip revealed mild degenerative lipping of the joint, and no fracture, dislocation, or narrowing; an MRI showed possible avascular necrosis.  (Tr. at 136).  Upon examination on December 22, 2003, orthopedist C. Daniel Smith, D.O., opined that it was too early to recommend surgery, and that if Claimant used crutches to take weight off of her hip, there was a chance surgery could be avoided.  (Tr. 148).  Dr. Smith noted Claimant's weight to be 160 pounds.  Claimant reported smoking one package of cigarettes each day and drinking twenty cups of coffee.  Dr. Smith recommended that Claimant stay off work for one month and return then for reexamination, quit smoking, and cut down tremendously on her caffeine consumption.   (Tr. 148).

At her return visit on January 19, 2004, Claimant reported that she had not used her crutches, but had stayed home from work and limited her walking.  (Tr. 150).  She also quit drinking caffeine but still smokes.   Dr. Smith expressed disappointment that Claimant had not followed his instructions and directed that Claimant could, with crutches, return to work full-time, and should return for reexamination in one month.  (Tr. at 150-51).  On her next visit on

- 10 -

February 18, 2004, Claimant was diagnosed with avascular necrosis in her right hip and was prescribed medications.  (Tr. at 155).

On February 27, 2004, orthopedic consultant Gregory C. Barnhill, D.O., stated that an MRI showed bone marrow edema in Claimant's hip joint, which was indicative of "only mild avascular necrosis."  He noted that Claimant was limping.  (Tr. at 166).

As noted above, Claimant filed for Social Security disability benefits on March 9, 2004. Upon examination on March 26, 2004, Dr. Barnhill noted cogwheel rigidity on internal/external rotation and abduction, as well as tenderness bilaterally secondary to an altered gait.  Dr. Barnhill diagnosed ongoing internal derangement of the right hip joint, and noted that Claimant represented the rare patient for whom arthroscopic surgery was a recommended procedure.  (Tr. at 167).

Claimant underwent arthroscopic surgery on April 2, 2004, after which she was diagnosed with osteochondritis desiccans of the right femoral head.  (Tr. at 159-61).  On April 9, 2004, Dr. Barnhill removed Claimant's sutures and ordered her to stay on crutches for three more weeks, at which time he would consider returning her to full weight-bearing.  (Tr. at 188).  On April 30, 2004, Dr. Barnhill noted that Claimant was now using only one crutch and would eventually graduate to the use of a cane.  He anticipated that Claimant's disability would continue for "six months or so."  (Tr. at 168).  On May 28, 2004, Dr. Barnhill noted that oral anti-inflammatory medication had improved Claimant's right hip synovitis, and that she was making "some progress."  He scheduled a follow-up visit in six weeks.  (Tr. at 169).

On July 6, 2004, non-examining consultant Janet Elliot, M.D., completed a "projected" physical RFC assessment based upon the anticipated improvement of Claimant's medical

condition by December 2004. Dr. Elliot indicated that Claimant would be able to occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk with normal breaks for about six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and push and/or pull without limitation. Dr. Elliot concluded that Claimant would have no manipulative, visual, or communicative limitations, but that she would need to avoid concentrated exposure to vibration, "due to surgery to avoid aggravation"; and hazards, such as machinery and heights, "for safety." Dr. Elliot stated that Claimant's symptoms were "credible for pain indicators" and that Claimant's right hip was improving with anti-inflammatories for synovitis. She anticipated that Claimant's symptoms would continue to improve to allow her to return to substantial gainful activity by December 2004, "based on progress post surgery and minimal surgical findings." (Tr. at 170-76).

When Claimant saw Dr. Barnhill again on August 6, 2004, he noted that Claimant had "gripping discomfort at the apices of her motion," and despite a fair amount of improvement in her overall discomfort, Claimant continued to lack full abduction. Dr. Barnhill discontinued Claimant's Vicodin, started her on Mobic, Ultram, and Darvocet, and stated that he would see her "as needed." (Tr. at 190).

On June 7, 2005, Claimant was seen at an outpatient pain clinic by Alejandro Blachar, M.D., for right side hip and buttock pain, with secondary complaints of generalized body pain and arthralgias. Claimant reported that her pain was worse with activity and walking, and was affecting her appetite, sleep, and physical activities. On examination, Dr. Blachar diagnosed Claimant with right hip pain and myofasciitis. Claimant reported that she was taking up to ten Vicodin a day. Dr. Blachar increased Claimant's Lortab (hydrocodone), and added Lidoderm and

- 12 -

Duragesic patches.  (Tr. at 205-07).  An MRI of that date of the right hip was "unremarkable."  (Tr. at 257).

A June 20, 2005 examination at a family care clinic by R.S. Kempton, M.D., showed diffused pain in all of Claimant's weight-bearing joints and hands, for which he referred Claimant to a rheumatologist.  (Tr. at 254-57).  On July 19, 2005, Claimant saw Dr. Blachar again and complained of deep, sharp pain from her right hip to her right knee and her ankles.  (Tr. at 203).  On August 23, 2005, Dr. Blachar noted that an MRI of Claimant's lumbosacral spine showed degenerative disc disease at L4-5 and L5-S1, without any central canal stenosis or neuroforaminal narrowing.  Dr. Blachar diagnosed chronic right hip pain; degenerative disc disease of the lumbosacral spine; lumbar facet joint syndrome; myofascial low back pain syndrome; and multiple-site osteoarthritis.  He increased the potency of the Duragesic patch.  (Tr. at 200-01).

On August 23, 2005, Claimant was seen at the family care clinic by Juan Dominguez, M.D.  (Tr. 252).  She reported that she was tired, that her muscles and joints ached "everywhere," and that she had diffuse pain and progressive intermittent leg weakness.  Dr. Dominguez noted that there was no weakness of Claimant's lower extremities and no edema.  He prescribed Arthrotec (a nonsteroidal anti-inflammatory drug similar to ibuprofen) and ordered various tests, including an ANA panel (blood test used to evaluate lupus or other connective tissue disorder) and an MRI of the brain and recommended smoking cessation.  (Tr. at 252).  The results of the ANA conducted on August 24, 2005, were positive, indicating a possible systemic rheumatic disease.  (Tr. at 263).  The MRI of the brain conducted on August 25, 2005, was normal.  (Tr. at 259-72).

On September 21, 2005, Dr. Blachar diagnosed chronic right hip pain, degenerative disc disease of the lumbar spine, lumbar facet joint syndrome, multiple-site osteoarthritis, and myofascial low back pain syndrome.  He prescribed 10 mg Percocet six times per day.  (Tr. at 198).  X-rays taken on September 22, 2005, revealed mild cortical irregularity in Claimant's right leg, and were normal for Claimant's left leg.  (Tr. at 240-41).

On September 22, 2005, Claimant was seen by Wendell Bronson, D.O., at the Arthritis and Osteoporosis Treatment Center in St. Joseph, Missouri.  Claimant told Dr. Bronson that she came to St. Joseph (125 miles from her home) weekly to care for a grandchild.  Dr. Bronson noted that Claimant's current medications included Lidoderm patches, Avinza, Lortab, and oxycodone.  On examination, he did not see obvious signs of synovitis or arthritis that would explain Claimant's complaints of pain.  (Tr. at 235-36).

Claimant returned to see Dr. Bronson on October 17, 2005, at which time he noted a two-year history of bone pain.  He noted that Claimant had a very low level of vitamin D, and that osteomalacia (softening of the bones due to vitamin D deficiency) should be considered.  (Tr. at 234).  On October 20, 2005, Dr. Blachar commented that Claimant had decreased motor function of her hands, and he diagnosed bilateral upper and lower extremity pain, bone pain, chronic right hip pain, degenerative disc disease of the lumbar spine, lumbar facet joint syndrome, multiple-site osteoarthritis, and myofascial low back pain syndrome.  (Tr. at 194-95).  On November 29, 2005, Dr. Blachar arrived at a similar diagnosis, increased Claimant's Avinza, and prescribed Cymbalta (used to treat depression as well as fibromyalgia) as an additional pain medication.  (Tr. at 191-92).

- 14 -

On December 9, 2005, Dr. Dominguez completed a Medical Source Statement ("MSS") regarding Claimant's physical condition, indicating in a check-box format that Claimant retained the ability to lift and/or carry less than five pounds frequently and five pounds occasionally; stand and/or walk for less than one hour continuously and for one hour throughout an eight-hour workday; and sit for thirty minutes continuously and for two hours throughout an eight-hour workday. Dr. Dominguez indicated that Claimant was limited in her ability to push and/or pull due to severe myalgia and neuro deficits, and that on a regular, continuing basis (eight hours each day, five days per week), Claimant could never climb, balance, stoop, or crawl; and could occasionally kneel, crouch, reach, handle, finger, or feel. Dr. Dominguez also opined that Claimant had to avoid exposure to environmental extremes and hazards and heights. (Tr. at 250-51).

On January 19, 2006, David W. Polston, M.D., conducted a neuromuscular assessment upon referral by Dr. Dominguez. (Tr. 322-25). An electrodiagnostic examination showed no evidence of generalized sensorimotor polyneuropathy, and Dr. Polston found no underlying neurological disorder as a cause for Claimant's pain. (Id.).

On January 27, 2006, Claimant was seen by rheumatologist Carmen Gota, M.D., upon referral by Dr. Dominguez. (Tr. 277). Dr. Gota noted that one ANA test had been positive and one had been negative. Pain was noted as a prominent symptom and Claimant's current medications included morphine and Cymbalta. On examination, Dr. Gota found normal range of motion of the spine, intact muscle strength, limitation in abduction and range of motion of both shoulders, no synovitis, and a normal gait. Full abduction of the right hip could not be tested "due to patient guarding," although some tarsal osteoarthritis was noted. Testing showed the absence

of significant depression, but a possible sleep disorder, and Dr. Gota recommended a sleep study

to evaluate for sleep apnea.  She also recommended that Claimant try to get off narcotics and

engage in aerobic exercise.  (Tr. at 277-79).

On March 21, 2006, Dr. Blachar diagnosed Claimant with bilateral upper and lower

extremity pain and numbness, degenerative disc disease in the lumbar spine, lumbar facet joint

syndrome, multiple site osteoarthritis, and myofascial low back pain syndrome.  He continued

Claimant's pain medications, increasing MSIR (oral morphine) to 30 mg four times per day for

"breakthrough" pain, and set another visit in two months.  (Tr. at 247-48).

In April and May 2006, Claimant underwent sleep studies and examinations performed by

Dr. Arora Ravinder which showed evidence of hypersomnolence (excessive sleepiness), mild sleep

apnea/hypopnea syndrome but not of narcolepsy, and possible fibromyalgia.  It was recommended

that Claimant cut down on her medications, specifically morphine, and take her Cymbalta at night.

She was also prescribed Provigil to improve wakefulness.  (Tr. at 294-311, 710).

On May 7, 2006, Claimant was admitted to the hospital for chest pain.  (Tr. 283).  Upon

discharge the next day she was diagnosed with acute exacerbation of chronic bronchitis,

fibromyalgia, and chronic severe lower back pain.  (Tr. at 282-92).  On May 22, 2006, Dr.

Blachar noted that Claimant had trouble lifting her left shoulder and had a limited range of motion

in her right shoulder.  (Tr. 245).  He diagnosed left upper extremity pain, degenerative disc

disease of the lumbar spine, lumbar facet joint syndrome, multiple site osteoarthritis, and

myofascial low back pain syndrome, and depression.  Claimant was prescribed Avinza, MSIR, and

Lidoderm patches.  Dr. Blachar noted that Claimant had been given MS Contin by her primary

care physician, and that she was on Cymbalta, Mirapex (used to treat tremors and restless leg

- 16 -

syndrome), and Provigil.  He took Claimant's unused MS Contin and he asked her not to go to other physicians for opioid medications.  (Tr. at 245-46).

While receiving treatment at Missouri Valley Physicians on April 4 and May 15, 2006, the doctor observed Claimant's gait to be intact and posture normal.  (Tr. 586-87, 589).

During treatment at the Neurology Clinic at Fitzgibbon Hospital on May 16, 2006, Dr. Arora noted Claimant has a history of excessive sleepiness and spells and recommended that she needs to cut down on her medications, specifically morphine.  (Tr. 294).

The record includes an Medical Source Statement regarding Claimant's mental condition, completed on August 14, 2006, by Robert Cunningham, M.D., who indicated in check-box format that Claimant was extremely limited in the ability to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  He also indicated that Claimant was markedly limited in many social interaction areas and adaptive abilities, and moderately limited in the ability to understand and remember very short and simple instructions.  (Tr. at 336-37).

On December 1, 2006, C. William Breckenridge, Psy.D., conducted a psychological evaluation of Claimant on referral by Disability Determinations and concluded that she had a Global Assessment of Functioning ("GAF") score of 60,[6] with moderate to severe medical problems as stressors.  Dr. Breckenridge stated that Claimant did not appear to be affected by a

---

[6]    A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "major" impairment in social, occupational, or school functioning; scores of 41 to 50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

- 17 -

mental disorder and that she was capable of understanding and remembering simple instructions and sustaining concentration and persistence while working on simple tasks.  He noted that Claimant denied any history of depression or of being depressed and that she said she was taking Cymbalta for "nerve pain," not for depression.  (Tr. at 341, 603-04).

On August 8, 2007, Dr. Craig Heligman completed a consultative medical examination. (Tr. 606).  Claimant indicated that she could walk one block, stand for fifteen minutes, sit for thirty to forty-five minutes, and lift/carry ten pounds.  (Tr. 607).  Although she is able to drive a vehicle, she restricts her driving due to exhaustion and fatigue.  Claimant reported having "no limitation in the ability to provide self-care and personal hygiene, eat and prepare food, communicate, clean and care for their residence."  (Tr. 607).  Dr. Heligman observed Claimant showed no evidence of discomfort while seated in a chair or on the examination table.  Claimant was able to mount and dismount the examination table without assistance.  (Tr. 607).  Dr. Heligman noted her gait and station to be normal.  (Tr. 609).  Nonspecific myalgias of unclear etiology, possible impingement syndrome of bilateral shoulders, and pseudogout were listed as diagnoses.  (Tr. 610).  Dr. Heligman opined Claimant capable of functioning at the sedentary level of labor with no restriction in sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, seeing, and traveling.  (Tr. 610).  With respect to mental impairments, Dr. Heligman found there are no work-related activities including understanding and memory, sustained concentration and persistence, social interaction, or adaptation that could not be performed by Claimant.  (Tr. 611).

- 18 -

In the Physical Residual Functional Capacity Assessment completed on August 9, 2007, K. Miller, a medical consultant, found Claimant to have no exertional limitations and opined that based on the level of debilitation claimed, she would be markedly deconditioned which is not the case.  (Tr. 615-16).

During a regularly scheduled appointment at Missouri Valley Physicians on October 17, 2007, Dr. Douglas Koehn noted this to be Claimant's first check up since May 2006.  (Tr. 658).

On January 1, 2008, Claimant reported experiencing right hip pain and running out of medications.  (Tr. 695).   The emergency room doctor diagnosed Claimant with chronic body pain and prescribed Vicodin.  (Tr. 698-99).

Claimant returned for treatment at Missouri Valley Physicians on January 9, 2008 and medication refills.  (Tr. 649).  The physical examination on March 12, 2008 revealed Claimant not to be in acute distress.  (Tr. 643-44).  Claimant returned on April 30, 2008 and reported swelling in the right hip after falling two night ago.  (Tr. 639).  Examination showed her hip to be normal to inspection and palpation and to have normal strength and stability and a full range of motion. (Tr. 641).  The May 1, 2008, x-ray showed a possible hairline fracture.  (Tr. 638).  Claimant reported after falling asleep, she had problems using her left arm and hand and after four days, her movement has not returned to normal.  (Tr. 631).   On October 21, 2008, Claimant reported smoking one package of cigarettes each day.  (Tr. 622).  Dr. Koehn observed Claimant's gait to be intact.  (Tr. 623).

On January 1, 2008, Claimant reported experiencing right hip pain and running out of medications.  (Tr. 695).   The emergency room doctor diagnosed Claimant with chronic body pain and prescribed Vicodin.  (Tr. 698-99).

- 19 -

On October 4, 2008, Claimant sought treatment in the emergency room at Fitzgibbon Hospital after injuring her wrist and a contusion.  (Tr. 663-70).

On July 16, 2009, Claimant returned for follow-up treatment.  (Tr. 712).  Claimant reported experiencing pain and swelling after falling a week earlier.  Examination showed hip tenderness but normal strength and tone and stability.  (Tr. 714).  The right hip x-ray showed the bony architecture to be intact without evidence of fracture or dislocation.  (Tr. 714).

The July 27, 2009 x-ray of Claimant's right hip showed degenerative change about the right hip.  (Tr. 718).

## IV.    The ALJ's Decision

The ALJ found that Claimant meets the insured status requirements of the Social Security Act through December 31, 2008.  (Tr. 386).  The ALJ found that Claimant has not engaged in substantial gainful activity during the period form her alleged onset date of December 2, 2003 through her date of last insured of December 31, 2008.  The ALJ found that the medical evidence establishes that Claimant has the severe impairments of generalized myalgias, a history of right hip surgery, mild degenerative disease of the lumbar spine, and mild sleep apnea, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 386-87).   The ALJ opined that Claimant has the residual functional capacity to perform the full range of light work, except she can only occasionally climb ladders, ropes or scaffolding and has to avoid concentrated exposure to vibration and hazards.  (Tr. 387). The ALJ found Claimant can stand and walk and sit for six of eight work hours, lift and carry up to ten pounds frequently and twenty pounds occasionally except for a period of less than twelve

- 20 -

continuous months around the time of her surgery.  (Tr. 387).  The ALJ found that through the

date of her last insured, Claimant could not perform her past relevant work.  (Tr. 392).

The ALJ found Claimant was born on October 16, 1954 which is defined as closely

approaching advanced age.  (Tr. 392).  The ALJ found Claimant has more than a high school

education and able to communicate in English.  The ALJ noted that the transferability of job skills

is not material to the determination of disability because using the Medical-Vocational Rules as a

framework supports a finding that Claimant is not disabled whether or not Claimant has

transferrable job skills.  Considering Claimant's age, education, work experience, and residual

functional capacity, the ALJ opined that there are jobs that exist in significant numbers in the

national economy that Claimant can perform such as mail sorter, bench assembler, and machine

tender.  (Tr. 393).  The ALJ concluded that Claimant has not been under a disability from

December 2, 2003, the alleged onset date through December 31, 2008, the date last insured.  (Tr.

394).

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or

she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the

Social Security Act, a disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the

claimant will be found to have a disability "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling.  If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled.  20 C.F.R. § 404.1520(d).  If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work.  If the claimant can still perform past work, she is not disabled.  20 C.F.R. § 404.1520(e).  If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy.  In step five, the ALJ must consider the claimant's "age, education, and past work experience."  Only if a claimant is found incapable of performing other work in the national economy will she be found disabled.  20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

- 22 -

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id.  The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to
   exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the
   March 7, 2013 claimant's impairments.

6. The testimony of vocational experts when required which
   is based upon a proper hypothetical question which sets forth the claimant's
   impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in formulating the RFC by failing to include all of her limitations. Claimant also contends that the ALJ failed to properly evaluate the medical opinions.

A.    <u>Residual Functional Capacity</u>

    Claimant contends that the ALJ erred in formulating her residual functional capacity by failing to include all of her limitations.

    A claimant's RFC is what he can do despite his limitations.  <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039 (8th Cir. 2001).  The claimant has the burden to establish his RFC.  <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 591 (8th Cir. 2004).  The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th Cir. 2005); <u>Eichelberger</u>, 390 F.3d at 591; 20 C.F.R. § 404.1545(a).  The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.  <u>Hutsell v. Massanari</u>, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted).  An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand.  <u>Id.</u>

    In his decision the ALJ thoroughly discussed the objective medical evidence not supporting the severity of her symptoms, her impairments controlled by treatment, noncompliance with recommended treatment, her daily activities, and third-party observations of Claimant.  <u>See Gray v. Apfel</u>, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities).  The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

The ALJ recognized that Claimant had a fairly good work record, but also noted that this factor standing alone is not controlling on the credibility determination.  A claimant's work history is but one factor an ALJ must consider when evaluating a claimant's credibility.  Given that the ALJ expressly acknowledged Claimant's good work history, the ALJ did not err in finding the other factors undermined her credibility.  See Schultz v. Astrue. 479 F.3d 979, 983 (8th Cir. 2007) (ALJ recognized claimant's "good work history" but still properly discounted claimant's subjective complaints of pain).

Specifically, the ALJ noted that no treating or consultative physician in any treatment notes stated that Claimant was disabled or unable to work or imposed significant long-term physical and/or mental limitations on Claimant's capacity for work except for a time period and after her hip surgery.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints).  After hip surgery, Dr. Barnhill opined that he anticipated Claimant's disability would continue for "six months or so."  The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints.  See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).  In particular, the ALJ noted that numerous examinations

showed Claimant to have full 5/5 strength in her legs, her gait to be intact, and station normal.

Indeed, on January 27, 2006, Dr. Gota recommended that Claimant try to get off narcotics and

engage in aerobic exercise.

In support of his credibility findings, the ALJ noted that no physician who examined

Claimant found her to have limitations consistent with disability.  See Young v. Apfel, 221 F.3d

1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [claimant]

submitted a medical conclusion that she is disabled and unable to perform any type of work.").

The lack of medical evidence supporting Claimant's complaints was a proper consideration when

evaluating her credibility, see Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006), as was his

failure to pursue more aggressive treatment.  See Tate v. Apfel, 167 F.3d 1191, 1197 (8th Cir.

1999).  In addition, the ALJ noted that no physician had ever made any medically necessary

restrictions, restrictions on her daily activities, or functional limitations.  Brown v. Chater, 87 F.3d

963, 964-65 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating

physicians supported the ALJ's decision of no disability).  Likewise, the ALJ  noted how the

medical record is devoid of any evidence showing that Claimant's condition has deteriorated or

required aggressive medical treatment.  Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir.

1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v.

Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993)(lack of ongoing treatment is inconsistent with

complaints of disabling condition).

Further, the record shows that there was a significant gap in Claimant's receiving medical

treatment.  In this regard, the record reflects that during the relevant time period Claimant did not

seek medical treatment for ten months from August 6, 2004 to June 7, 2005.  Claimant's failure

to seek medical treatment contradicts her assertion of disabling pain.  Edwards v. Barnhart, 314

F.3d 964, 968 (8th Cir. 2003) (claimant's failure to pursue regular medical treatment detracted

from credibility); see Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).  Such gaps

suggest that Claimant's subjective complaints of disabling pain are not entirely credible.  "[T]he

failure to seek medical treatment for such a long time during a claimed period of disability tends

to indicate tolerable pain."  Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995); see Kelley v.

Barnhart, 372 F.3d 958, 961 (8th Cir. 1994) (holding that infrequent treatment is a basis for

discounting subjective complaints).

     Likewise, without good reason, failure to follow prescribed treatment is grounds for

denying an application for benefits.  Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).  The ALJ

noted how Claimant had been noncompliant with treatment prior to her hip surgery.  Dr. Smith

instructed Claimant to use crutches and recommended smoking cessation, but the record does not

reflect that she did so.

     The ALJ also found Claimant's impairments to be controlled by treatment.  Indeed, after

the hip surgery, her condition improved, the MRI studies were unremarkable, and a right hip x-ray

was negative.  Conditions which can be controlled by treatment are not disabling.  See Davidson

v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir.

2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be

controlled by treatment, it cannot be considered disabling); Warford v. Bowen, 875 F.2d 671, 673

(8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not

disabling).

The ALJ also considered evidence suggesting Claimant had misused her medications. Dr. Barnhill discontinued Claimant's Vicodin in August 2004 noting "[w]e will try to get her down off Vicodin." (Tr. 190). In January 2006, Dr. Gota recommended that Claimant try to get off narcotics. Likewise, on May 16, 2006, Dr. Arora recommended Claimant to cut down on her medications, specifically morphine. (Tr. 294). That same month, Dr. Blachar noted that Claimant had been given MS Contin by her primary care physician, and he took her unused MS Contin and he asked her not to go to other physicians for opioid medications. Cf, Anderson v, Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) ("A claimant's misuse of medications is a valid factor in an ALJ's credibility determinations."); Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995) (observing that claimant's "drug-seeking behavior further discredits her allegations of disabling pain.").

Next, the ALJ cited how third-party observations noted Claimant not to be in acute or apparent distress. During numerous examinations, doctors noted Claimant to have full range of motion, full strength in all of her extremities, intact gait, and normal posture. The ALJ must judge the credibility of the claimant's subjective complaints in light of observations by third parties, including physicians. Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). In discounting Claimant's credibility, the ALJ properly noted how Claimant had been frequently observed by treating sources over the years to be in no acute or apparent distress. Likewise, Claimant's complaints of weakness were not detected on examination. During the examination on August 8, 2007 by Dr. Heligman observed Claimant showed no evidence of discomfort while seated in a chair or on the examination table, and she was able to mount and dismount the examination table without assistance. Dr. Heligman noted her gait and station to be normal. Dr.

Heligman opined Claimant capable of functioning in the workplace with no restriction in sitting,

standing, walking, lifting, carrying, handling objects, hearing, speaking, seeing, and traveling, and

no work-related activities including understanding and memory, sustained concentration and

persistence, social interaction, or adaptation that could not be performed by Claimant.

During the first hearing, Claimant testified that she could do a load of laundry, load the

dishwasher, drive to the grocery store six blocks away, and has no difficulty shopping at her local

grocery store.  Further, during the examination on August 8, 2007 by Dr. Heligman, Claimant

reported having "no limitation in the ability to provide self-care and personal hygiene, eat and

prepare food, communicate, clean and care for their residence."  "Acts which are inconsistent with

a claimant's assertion of disability reflect negatively upon that claimant's credibility."  Johnson v.

Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001).  During the second hearing, when asked if she could

work a sedentary nurse job such as a phone nurse in a medical office, Claimant responded no

because she has to lie down so much.  There is no objective medical evidence substantiating

Claimant's need to lie down.   The record does not reflect physician imposed restrictions thus

Claimant's restrictions in daily activities are self-imposed rather than by medical necessity.  See

e.g., Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is

a medical question requiring medical evidence; record did not contain any evidence that medical

condition required claimant to lie down for hours each day); See Zeiler v. Barnhart, 384 F.3d 932,

936 (8th Cir. 2004) (([T]here is no medical evidence supporting [the claimant's] claim that she

needs to lie down during the day."); Fredrickson v. Barnhart, 359 F.3d 972, 977 n.2 (8th Cir.

2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his

physicians or that they prescribed that he elevate his foot or lie down daily.").  Likewise, no

doctor determined Claimant needed to lie down as a medical necessity.  Thus, if Claimant was not lying down out of medical necessity, she must be doing so out of choice.  See Craig v. Chater, 943 F. Supp. 1184, 1188 (W.D. Mo. 1996); Cf.  Harris v. Barnhart, 356 F.3d 936, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). These observations are supported by substantial evidence on the record as a whole.

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC those impairments and restrictions found to be credible.  See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record.").  In relevant part, the ALJ included a limitation of only occasionally climbing ladders, ropes or scaffolding and avoiding concentrated exposure to vibration and hazards.  The ALJ found that Claimant has the residual functional capacity to perform the full range of light work.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled.  Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible.  Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints.  See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).  Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a

whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included the objective medical evidence not supporting the severity of her symptoms, her impairments controlled by treatment, noncompliance with recommended treatment, her daily activities, and third-party observations. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) (affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of

- 32 -

severe pain).  The undersigned finds that substantial evidence supports the ALJ's finding the

medical records do not support the extent of Claimant's subjective complaints of pain.  See Flynn

v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (standard of review; substantial evidence is enough

that reasonable mind might accept it as adequate to support decision).

The substantial evidence on the record as a whole supports the ALJ's decision.  Where

substantial evidence supports the Commissioner's decision, the decision may not be reversed

merely because substantial evidence may support a different outcome.  Woolf v. Shalala, 3 F.3d

1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

B.     Evaluation of Medical Opinions

Claimant also contends that the ALJ failed to properly evaluate the medical opinions.

"A treating physician's opinion is given controlling weight if it 'is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [a claimant's] case record.'"  Tilley v. Astrue, 580 F.3d 675, 679 (8th

Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord Halverson v.

Astrue, 600 F.3d 922, 929 (8th Cir. 2010); Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir.

2009).  "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an

opinion does not automatically control because the [ALJ] must evaluate the record as a whole."

Wagner, 499 F.3d at 849 (internal quotations omitted); accord Martise v. Astrue, 641 F.3d 909,

925 (8th Cir. 2011).  Thus, "'an ALJ may credit other medical evaluations over that of the treating

physician when such assessments are supported by better or more thorough medical evidence.'"

Id. (quoting Brown v. Astrue, 611 F.3d 909, 951 (8th Cir. 2011)).  And, "'[w]hen deciding how

much weight to give a treating physician's opinion, an ALJ must also consider the length of the

treatment relationship and the frequency of examinations.'" Id. (quoting Brown, 611 F.3d at 951).
See also 20 C.F.R. § 404.1527(c) (listing six factors to be evaluated when weighing opinions of
treating physicians, including supportability and consistency).

"It is permissible for an ALJ to discount an opinion of a treating physician that is
inconsistent with the physician's clinical treatment notes," Davidson, 578 F.3d at 843, or consists
of conclusory statements. Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010). See Renstrom
v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ properly gave treating physician's opinion
non-controlling weight when that opinion was largely based on claimant's subjective complaints
and was inconsistent with other medical experts); McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir.
2011) (rejecting claimant's challenge to lack of weight given treating physician's evaluation of
claimant's mental impairments when "evaluation appeared to be based, at least in part, on
[claimant's] self-reported symptoms and, thus, insofar as those reported symptoms were found to
be less than credible, [the treating physician's] report was rendered less credible"); Kirby v.
Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (finding that ALJ was entitled to discount treating
physician's statement as to claimant's limitations because such conclusion was based primarily on
claimant's subjective complaints and not on objective medical evidence); Clevenger v. S.S.A., 567
F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician
that was not corroborated by treatment notes); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th
Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only
of conclusory statements.").

To the extent that Dr. Heligman opined that Claimant could perform sedentary work, this
opinion is contradicted by other objective medical evidence and the findings made by the medical

records and his own findings.  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding

that a treating physician's opinion does not automatically control or obviate the need to evaluate

the record as a whole and upholding the ALJ's decision to discount the treating physician's

medical-source statement where limitations were never mentioned in numerous treatment records

or supported by any explanation).  Indeed, Dr. Heligman's examination findings were essentially

normal. He noted her gait and station to be normal, she was able to heel and toe walk without

assistance, and examination showed normal motor strength in all of her extremeties and normal

grip strength.  Indeed, during the examination, Claimant reported having "no limitation in the

ability to provide self-care and personal hygiene, eat and prepare food, communicate, clean and

care for their residence."  Further, Dr. Heligman was a consulting physician, not a treating

physician.  Therefore, the ALJ was not required to give his opinion controlling weight.  See SSR-

96-2p.  Additionally, because, the opinions of Claimant's treating doctors were sufficient for the

ALJ to make a determination and because there was no reason for the ALJ to discredit the

opinion of treating doctors, the ALJ was not required to give controlling weight to the opinion of

Dr. Heligman.  See Anderson v. Barnhart, 344 F.3d 809, 813 (8th Cir. 2003) (citing Cantrall v.

Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000)).

       Next, the opinion of Dr. Heligman was not supported by better or more thorough medical

evidence than Claimant's treating sources.  An ALJ is justified in discrediting a doctor's

conclusory opinions that are based on the claimant's own subjective complaints and are

unsupported by other findings.  Woolf v. Shalala, 3 F.3d 1210 (8th Cir. 1993).   Further, the ALJ

gave good reasons for not giving controlling weight to the opinion of Dr. Heligman.  See, e.g.,

King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by

conclusory statements or total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, or diagnostic evidence).  Moreover, upon not giving controlling weight to Dr. Heligman's opinion, the ALJ evaluated the record as a whole, as he was required to do so.  <u>See Hogan v. Apfel</u>, 239 F.3d 958, 961 (8th Cir. 2001) ("Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole.").

In the instant case, the record includes notes of three visits to Dr. Dominguez before he completed the MSS- a series of check marks to rate the functional limitations of Claimant.  A checklist format and conclusory opinions, even of a treating physician, are of limited evidentiary value.  <u>Wildman v. Astrue</u>, 596 F.3d 959, 964 (8th Cir. 2010); <u>Wiese v. Astrue</u>, 552 F.3d 728, 730 (8th Cir. 2009).  In <u>Wildman</u>, the Eighth Circuit held that the ALJ had properly discounted a treating physician's assessment as conclusory when that "opinion consist[ed] of three checklist forms, cite[d] no medical evidence, and provide[d] little to no elaboration."  596 F.3d at 964.  Further, Dr. Dominguez's "check-off form" medical source statement appears to have been procured and submitted by counsel.  The statement did not cite any clinical tests results or findings and was inconsistent with the physician's previous treatment notes.  <u>Id.</u>; <u>Holstrom v. Massanari</u>, 270 F.3d 715, 721 (8th Cir. 2001) ("[T]he checklist format, generality, and incompleteness of the assessments limit their evidentiary value.").  Further, the lack of support in his own treatment notes for the functional limitations is underscored by his failure to provide reasons for his conclusion.  In <u>Perks v. Astrue</u>, 687 F.3d 1086, 1092 (8th Cir. 2012), the Eighth Circuit Court of Appeals noted that it has "previously held that '[p]hysician opinions that are

internally inconsistent . . . are entitled to less deference than they would receive in the absence of inconsistencies.'" (quoting Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)) (alterations in original).

The ALJ determined to give the greatest weight to Dr. Barnhill, a treating physician, and Dr. Janet Elliot, an agency medical consultant. See Cantrell v Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000) (holding that the ALJ properly exercised his discretion to favor the thorough reports of agency-funded, one-time consultants over the contrary check-box report of a treating physician). The undersigned notes that although Dr. Barnhill last treated Claimant in August 2004, the record shows that there was a significant gap in Claimant's receiving medical treatment thereafter.  In this regard, the record reflects that during the relevant time period Claimant did not seek medical treatment for ten months from August 6, 2004 to June 7, 2005.

Claimant additionally argues that the ALJ violated his duty to develop a full and fair record by failing to obtain evidence that addresses Claimant's ability to function in the workplace.

A social security hearing is a non-adversarial proceeding, and thus an ALJ has a duty to develop the record fully, including seeking clarification from treating physicians if a crucial issue is underdeveloped or undeveloped. See Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006); Garza v. Barnhart, 397 F.3d 1087, 1089-90 (8th Cir. 2005) (ALJ's duty to develop record fully and fairly exists even when claimant is represented by counsel).  Nonetheless, "the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010) (citations omitted); accord Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

An ALJ's duty to develop the record arises only if a crucial issue was undeveloped.  The record contains medical evidence from the relevant time period regarding Claimant's alleged disabilities.  See Onstead v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993) (reversal due to failure to develop the record is warranted only where the failure is unfair or prejudicial). While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.  Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).  After a review of the medical record, the undersigned finds the record contains medical and opinion evidence showing her ability to function in the workplace.

"Where 'the ALJ's determination is based on all the evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations,' the claimant has received a "full and fair hearing.'" Jones v. Astrue, 619 F.3d 963, 969 (8th Cir. 2010)(quoting Halverson v. Astrue, 600 F.3d 922, 933 (8th Cir. 2010)).  After a review of the medical record, the undersigned finds the record contains medical and opinion evidence sufficient for the ALJ to determine Claimant's RFC.  See Martise, 641 F.3d 926-27 (ALJ fails to develop medical record only if the medical records before him do not provide sufficient evidence for him to determine whether claimant is disabled).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case

differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning, 958 F2d at 821.

Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the decision of the

Commissioner be affirmed.

Judgment shall be entered accordingly.

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this  _21st___ day of March, 2013.